CLERK'S OFFICE
U.S. DISTRICT COURT
AT ROANOKE, VA
FILED

August 05, 2024
LAURA A. AUSTIN, CLERK
BY: s/ S. Neily, Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| CHRISTY S.[1] O/B/O | ) | |
| A.S., a minor child, | ) | |
| | ) | Civil Action No. 7:23-cv-00034 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | REPORT AND RECOMMENDATION |
| | ) | |
| MARTIN O'MALLEY[2], | ) | |
| Commissioner of Social Security, | ) | By: C. Kailani Memmer |
| | ) | United States Magistrate Judge |
| Defendant. | ) | |

Plaintiff Christy S. ("Christy") on behalf of A.S., a minor child, filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") finding A.S. not disabled and therefore ineligible for supplemental security income ("SSI") under the Social Security Act ("Act"). 42 U.S.C. §§ 1381–1383f. This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). ECF No. 26. As directed by the order of referral, the undersigned now submits the following report and recommended disposition. Neither party has requested oral argument nor would argument aid in the decisional process; therefore, this case is ripe for decision.

For the reasons detailed below, I recommend the presiding District Judge **DENY** Christy's Motion for Summary Judgment, ECF No. 14, **GRANT** the Commissioner's Motion for Summary Judgment, ECF No. 24, **AFFIRM** the Commissioner's final decision, and **DISMISS** this case from the Court's active docket.

---

[1] Due to privacy concerns, I use only the first name and last initial of the claimant in social security opinions.
[2] Martin O'Malley became the Commissioner of Social Security on December 20, 2023. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Martin O'Malley should be substituted for Kilolo Kijakazi as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

## STANDARD OF REVIEW

The court limits its review to a determination of whether substantial evidence exists to support the Commissioner's conclusion that Christy, on behalf of A.S., failed to demonstrate that A.S. was disabled under the Act.[3] *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations and alterations omitted); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (emphasizing that the standard for substantial evidence "is not high"). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Mastro*, 270 F.3d at 176 (quoting *Craig*, 76 F.3d at 589). Nevertheless, the court "must not abdicate [its] traditional functions," and it "cannot escape [its] duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. *Hays v. Sullivan*, 907 F. 2d 1453, 1456 (4th Cir. 1990).

In contrast, remand is appropriate if the Administrative Law Judge's ("ALJ") analysis is so deficient that it "frustrate[s] meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (noting that "remand is necessary" where the court is "left to guess [at] how the ALJ arrived at his conclusions"). The ALJ must sufficiently articulate his findings such that the district court can undertake meaningful review. *See Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016).

---

[3] Under the Act, a claimant under the age of eighteen is considered "disabled" for purposes of eligibility for SSI payments if he has "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i)

## CLAIM HISTORY

A.S. was born in November 2010. R. 106. On November 30, 2019, Christy submitted an application for benefits alleging that A.S. has been disabled since February 28, 2012 due to limitations imposed by Charcot-Marie-Tooth disease[4], muscular ventricular septal defect, severe balance defect, difficulty speaking, difficulty walking, shaking hands when he tries to use them, decreased muscle strength, lower extremity weakness, irritable bowel syndrome, anxiety, neuropathic pain, chronic vomiting, vitamin D deficiency, wheezing at night, and headaches. R. 237.

A child is disabled under the Social Security Act if he has a "physical or mental impairment, which results in marked and severe functional limitations, and . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). Under the regulations, the determination of whether a child meets the definition of disability requires a three-step inquiry. 20 C.F.R. § 416.924. The first step is to determine whether the child is working and performing substantial gainful activity. *Id*. § 416.924(b). If the child is not working, it must then be determined whether the child suffers from a severe impairment or combination of impairments. *Id*. § 416.924(c). If the child suffers from a severe impairment or combination of impairments, it must then be determined whether the child's impairment(s) meet, medically equal, or functionally equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id*. § 416.924(d).

To determine whether an impairment is functionally equivalent to a listed impairment, the ALJ evaluates its severity in six domains: (1) acquiring and using information; (2) attending and

---

[4] Charcot-Marie-Tooth disease is a hereditary neurological disorder that damages the peripheral nerves and, over time, can result in symptoms including alternation or loss of sensation and atrophy of muscles in the feet, legs, and hands. *See* https://medlineplus.gov/genetics/condition/charcot-marie-tooth-disease/

completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. *Id*. § 416.926a(b)(1). Functional equivalence exists if the ALJ finds a "marked" limitation in two areas of functioning or an "extreme" limitation in one area of functioning. *Id*. § 416.926a(d). A "marked" limitation is one that "interferes seriously with [the claimant's] ability to independently initiate, sustain, or complete activities." *Id*. § 416.924a(e)(2)(i). A "marked" limitation "also means a limitation that is 'more than moderate' but 'less than extreme.'" *Id*.

Christy's claim was denied at the initial and reconsideration levels of review. R. 106. On September 29, 2021, ALJ Joseph Scruton held a hearing to consider A.S.'s disability claim. R. 47–72. At the hearing, Christy amended A.S.'s alleged onset date of disability to November 30, 2019, the same date as the application. R. 53. Counsel represented A.S. at the hearing, which included testimony from Christy. R. 59–71.

On January 5, 2022, the ALJ issued his decision finding that A.S. is not disabled. R. 8–30. The ALJ determined that A.S. was not engaged in substantial gainful activity and suffered from the severe impairments of Charcot-Marie-Tooth disease, thoracic spine kyphosis, and anxiety disorder. R. 14. The ALJ concluded at step three that A.S.'s severe impairments or combination of impairments did not meet or medically equal the severity of one of the listed impairments. R. 15–16. The ALJ specifically considered Listings 112.06 and 12.06 (anxiety and obsessive-compulsive disorders), 101.15 and 1.15 (compromise of a nerve root), 101.18 and 1.18 (abnormality of a major joint), and 111.14 and 11.14 (peripheral neuropathy). *Id.*

The ALJ considered the six functional domains and concluded that A.S. had a "less than marked limitation" in all domains, other than "a marked limitation" in moving about and manipulating objects. R. 17–29. Thus, the ALJ concluded that A.S. was not disabled. R. 30. Christy

appealed the ALJ's decision, and on November 21, 2022, the Appeals Council denied her request for review. R. 1–6. This appeal followed.

## FACTS

### A.  Medical Records

On November 10, 2016, A.S. presented to the care of Michael A. Sisk, M.D., in the Pediatric Neurology department at Carilion Clinic. R. 784. Dr. Sisk noted that A.S. "is off to a great start as an older kindergarten student," and his mother reported that he "gets constant praise." *Id.* Dr. Sisk noted that A.S.'s main symptom of his Charcot-Marie-Tooth disease is "pain in his knees and the back of his legs." *Id.* He noted that A.S. "actually has no particular weakness in his legs, but does have almost complete loss of reflexes now and early beginning of pes cavus deformity." *Id.* Dr. Sisk started A.S. on a trial of gabapentin starting at 50 mg twice daily and increasing to 100 mg twice daily if A.S. improved. *Id.*

On December 19, 2016, A.S. presented to the care of Andre Jenkins, NP-C, of Shawsville Family Medicine. R. 780–81. A.S.'s chief complaints were headaches and cough. R. 780. A.S. indicated that his headaches were always in the same place over his left eye. *Id.* A.S.'s mother reported that she has been called by A.S.'s school to pick him up because of his headaches, and A.S. sometimes has vomiting with his headaches. *Id.* Mr. Jenkins planned for A.S. to make diet changes to cut down on lunch-meat type foods and increase his fluid intake. R. 781.

On February 23, 2017, A.S. returned to the care of Dr. Sisk for a follow-up appointment. R. 777. Dr. Sisk discontinued A.S.'s gabapentin after one week because it caused him to become "irritable and moody and angry." *Id.* Dr. Sisk noted that A.S's "pain tends to be in the knees and ankles bilaterally, more as the day goes on, and in his dominant right hand," as he "tends to get cramping and pain when he writes a lot at school." *Id.* On physical examination, Dr. Sisk noted

that A.S.'s "strength is good, both proximally and distally," and he noted no abnormalities in

A.S.'s hands; however, he did note that he was "not able to get any deep tendon reflexes today."

*Id.*

On May 3, 2017, A.S. presented to the care of Mary Leatherland, M.D., at Shawsville

Family Medicine. R. 769–70. A.S.'s mom reported that A.S. was anxious at the beginning of the

school year, and that he started seeing a guidance counselor due to ongoing anxiety. R. 769.

Physical examination findings were unremarkable aside from an elevated pulse. R. 770. Dr.

Leatherland diagnosed A.S. with behavior concern and wheezing. *Id.*

On June 16, 2017, A.S. presented to the care of Kelly Pawlak, QMHP-C, at New River

Valley Community Services for administrative intake. R. 353–62. A.S.'s mother stated that A.S.

had "some great days and some bad days," and that he had depression, anxiety, and anger at

home. R. 354. The record indicates that A.S. "will cry for hours, shaking, [and he] shuts down."

*Id.* The triggers for A.S.'s behavioral decompensation are listed as "[l]eaving mom, leaving dad,

being told, having to do something he doesn't want to do, [and] bed time." *Id.* In Functioning

Skills/Status, Ms. Pawlak notes that "[A.S.] is always ready to learn, really smart, advanced

academically, [and] figures things out quickly," and that he is "good at expressing himself,"

however he "needs helping moving through getting mad, crying spells, anxiety, and increase

independence." R. 356. Diagnosis was deferred. R. 359.

On June 21, 2017, Ms. Pawlak conducted a home visit. R. 365–66. Ms. Pawlak noted that

A.S. and his father were playing a video game together at the time. R. 365. A.S.'s mom reported

that A.S. "was bullied last year by peers." *Id.*

On July 11, 2017, A.S. returned to the care of Ms. Pawlak. R. 370. Ms. Pawlak noted that A.S. "demonstrated higher energy and more challenging behaviors" than during the previous visit, "as he was not able to engage in video games." *Id.*

On July 24, 2017, Ms. Pawlak called A.S.'s mother to talk about A.S.'s condition. R. 372. They discussed how vacation bible school went, and Pawlak noted "no signs of anxiety." *Id.*

On August 2, 2017, A.S. presented to the care of Julie Zielinski, M.D., for an orthopedic evaluation. R. 765–66. A.S.'s chief complaint was bilateral foot laxity with recurrent inversions with bilateral numbness in his toes. R. 765. He reported his right ankle was worse than his left. *Id.* He noted that when he trips, he has self-limiting numbness for about five minutes. *Id.* A.S. indicated that he used arch supports, which worsened his pain. *Id.* Physical examination findings revealed toe walking, ligamentous laxity with hypermobile joints in the upper and lower extremities, weakness of toe flexion, and easy fatigability of the ankle during tiptoe standing. R. 766. Dr. Zielinski assessed A.S. with Charcot Marie Tooth disease, toe walking, bilateral ankle laxity, and bilateral pes planovalgus (flatfoot). *Id.* She planned for A.S. to begin home exercises and referred him for ankle/foot orthotics. *Id.*

On August 9, 2017, Ms. Pawlak spoke with A.S.'s mother, who reported that A.S.'s first day of school went well, and that A.S. did not cry. R. 381.

On August 18, 2017, Ms. Pawlak spoke with A.S.'s mother, who reported that A.S. was not having any meltdowns, tears, or sickness at that time. R. 383. According to A.S.'s mother, he reported only positive feelings and events at school. *Id.*

On August 18, 2017, Ms. Pawlak observed A.S. at school. R. 388. She noted that A.S. was engaged and social, followed directions appropriately, and showed no signs of anxiety. *Id.* A.S.'s teacher reported that he had never worn an ankle brace to school, which he was supposed

to have been doing daily. *Id.* Additionally, A.S.'s physical education teacher reported that they were not aware of any needs or limits on A.S. for physical education. *Id.*

On August 24, 2017, A.S. returned to the care of Dr. Sisk. R. 762. A.S.'s mother reported that A.S. was having difficulty with handwriting and physical education in school. *Id.* She further reported that A.S. had falls. *Id.* A.S.'s gait was notable for flat foot contact or on toes, and his range of motion was reduced in his ankles and hamstrings bilaterally. R. 762–63. A.S.'s strength was intact in his arms, hands, and fingers; however, he was areflexic in both the upper and lower extremities. R. 763. Dr. Sisk recommended A.S. be referred to a pediatric physical therapist. *Id.*

On August 28, 2017, Ms. Pawlak met with A.S. and his mother at their home. R. 390. His mother reported that A.S. felt anxious about wearing ankle braces to school, and that the braces made him fall easily. *Id.*

On September 19, 2017, Ms. Pawlak communicated with A.S.'s teacher, who reported that A.S. made himself sick at school one day and had not been wearing his leg braces to school; however, the teacher reported typical social development and high academic skill and progress. R. 394.

On September 26, 2017, Ms. Pawlak spoke with A.S. and his mother. R. 396. A.S.'s mother reported that A.S. was bullied by an older classmate during recess. *Id.*

On October 12, 2017, Ms. Pawlak spoke with A.S.'s teacher and school case manager. R. 405. A.S.'s teacher expressed concerns about A.S.'s anxiety, which had increased over the previous two weeks. *Id.* A.S.'s attendance was low because of medical appointments. *Id.* The teacher expressed concern that A.S.'s mother's anxiety might be impacting A.S.'s school attendance. *Id.* Both A.S.'s teacher and the school case manager reported that they thought A.S.'s

reports of bullying were made up, because they indicated poor reporting and contradicting reports from A.S..

On October 13, 2017, Ms. Pawlak spoke with A.S.'s mother. R. 411. A.S.'s mother reported that A.S. had a meltdown about the bus and bullying, and A.S.'s anxiety about bullying was incredibly high. *Id.* A.S.'s mom indicated that she did not feel heard by A.S.'s school. *Id.*

On October 17, 2017, A.S. returned to the care of Mr. Jenkins at Shawsville Family Medicine. R. 752–53. A.S.'s chief complaint was worsening anxiety and vomiting. R. 753. A.S.'s mom reported that A.S. had severe anxiety at school and felt anxious about teachers and other students. *Id.* She stated that A.S. gets worked up and emotional over little things. *Id.* A.S.'s mom indicated that both she and A.S.'s school thinks A.S. should be medicated for his anxiety. *Id.* Mr. Jenkins noted surprise to hear that A.S. was having difficulty at school, because A.S. did not demonstrate any symptoms of anxiety at that visit.  *Id.* Mr. Jenkins declined to initiate medication for anxiety. *Id.*

On October 19, 2017, Ms. Pawlak met with A.S. and his mother to discuss safely transitioning to ride the bus to school. R. 423. A.S. was cursing and running away while sobbing and screaming about his fear of school. *Id.*

On October 19, 2017, Ms. Pawlak received an email from A.S.'s school-based case manager, who indicated that no one at the school had any concerns about anxiety, and they believed A.S.'s anxiety was a learned behavior rewarded with going home. R. 427.

On October 19, 2017, Ms. Pawlak spoke with a female doctor[5] who reported no concerns about A.S.'s anxiety, and that the doctor believed that A.S.'s anxiety is a learned behavior rewarded by going home and brought on by A.S.'s mother. R. 429.

---

[5] The record does not indicate which doctor Ms. Pawlak spoke with.

On November 2, 2017, A.S. returned to the care of Dr. Zielinski for orthopedic re-evaluation. R. 747–49. A.S.'s mother reported that A.S. was wearing his ankle/foot orthotics for only a couple hours each day before A.S. complained of foot numbness. R. 748. Dr. Zielinski reported that A.S. "was swearing Fbombs [sic] multiple times in the office today." *Id.* She also noted that A.S. was not particularly compliant with examination. *Id.* Physical examination revealed bilateral flatfoot, Achilles tightness with lateralization of tendon, ligamentous laxity with hypermobile joints in the upper and lower extremities, weakness of toe flexion, and easy fatigue of the ankles with tiptoe standing. *Id.* Dr. Zielinski recommended A.S. do home exercises and continue using ankle/foot orthotics. R. 749.

On November 9, 2017, Ms. Pawlak spoke with A.S.'s mother to discuss outpatient treatment. R. 436. A.S.'s mother indicated that she wanted to medicate A.S. to help with anxiety. *Id.* A.S.'s primary care physician did not feel comfortable prescribing anxiety medication, so A.S.'s mother and Ms. Pawlak discussed working together for a psych referral. *Id.*

On November 20, 2017, Theresa Holt, QMHP-C, of New River Valley Community Services, went to A.S.'s school to observe him and meet with his teacher. R. 439. A.S.'s teacher reported that his attendance improved in the last few weeks. *Id.* A.S.'s teacher denied A.S. struggling with anxiety and indicated her belief that A.S.'s mother was the one struggling with anxiety. *Id.* A.S.'s teacher indicated that he interacted normally with his classmates and had no trouble needing redirection. *Id.*

On December 18, 2017, A.S. presented to the care of Mary Gaskill, LPC, of New River Valley Community Services, for a comprehensive evaluation. R. 461–66. A.S.'s mother reported A.S. was continuing to experience anxiety before going to school, and she reported that A.S. would cry or vomit before school. R. 461. On examination, A.S. was pleasant, cooperative, and

oriented, and mental status examination findings were unremarkable. R. 463–64. Ms. Gaskill

noted that A.S. meets the DSM criteria for Adjustment Disorder with anxiety, and she

recommended that A.S. be placed into outpatient care. R. 465–66.

On January 16, 2018, A.S. presented to the care of Kimberly Price, LPC, of New River

Valley Community Services for psychotherapy. R. 469. A.S.'s mom reported that A.S. continued

to struggle with daily anxiety, largely centered around school. *Id.* She reported that A.S. was

continuing to be teased at school. *Id.*

On February 7, 2018, A.S. returned to the care of Mr. Jenkins at Shawsville Family

Medicine. R. 744–45. A.S. reported that he fell at school the previous day and hit the back of his

head. R. 744. Mr. Jenkins noted that A.S.'s head injury seemed resolved. R. 745.

On March 6, 2018, A.S. presented to the care of Michael Hart, M.D., a pediatric

gastroenterologist, for an evaluation. R. 738–42. A.S.'s chief complaint was gastroesophageal

reflux disease ("GERD"). R. 740. Physical examination findings were unremarkable. R. 742. Dr.

Hart diagnosed A.S. with chronic vomiting and generalized abdominal pain, and he referred A.S.

for an upper endoscopy and flexible sigmoidoscopy with biopsy. R. 738–39.

On March 16, 2018, A.S. underwent an EGD with biopsy, which returned normal results.

R. 807–09.

On March 22, 2018, Alexis Wenz, B.S., of New River Valley Community Services, who

was assigned as A.S.'s new case manager, spoke with Ms. Price, A.S.'s counselor at New River

Valley Community Services. R. 481. Ms. Price indicated that she was considering discharge

because A.S. had missed several appointments. *Id.*

On April 4, 2018, Ms. Wentz met with A.S.'s mother and Anne Guthrie[6] to discuss A.S.'s attendance. R. 486. They discussed that A.S.'s medical appointments should be scheduled on the same day to reduce absences. *Id.* A.S.'s mom asked Ms. Wentz to look into Section 8 housing for her. *Id.*

On May 11, 2018, A.S. had a fifth no-show or late cancel at New River Valley Community Services, and Ms. Price indicated A.S. would need to be discharged from outpatient services at that time. R. 502–03.

On May 17, 2018, Alex Farrar, B.S., of New River Valley Community Services, spoke with A.S.'s mother to inquire why A.S. missed his outpatient appointments. R. 506. A.S.'s mother indicated that A.S. did not need outpatient services anymore. *Id.*

On June 4, 2018, A.S. returned to the care of Dr. Hart, a pediatric gastroenterologist, for a follow-up visit. R. 725–26. Dr. Hart noted that A.S.'s biopsies were "ok," and he ordered A.S. to undergo additional tests to evaluate the cause of A.S.'s abdominal pain, constipation, and vomiting. R. 725.

On June 28, 2018, A.S. returned to the care of Dr. Sisk for a neurological follow-up. R. 720–23. A.S.'s mother reported that he falls often when playing at home or on the playground; however, she refused Dr. Sisk's offer to coordinate for physical and occupational therapy services for A.S.. R. 723. Dr. Sisk noted that A.S. "remains a tiny, tiny child," but that A.S. appeared healthy and his strength was good for his size. *Id.* He also noted that A.S. was diagnosed with astigmatism and was prescribed glasses. *Id.* Dr. Sisk observed A.S. walk and run in a hallway and noted that A.S. "has a really stable run." *Id.*

---

[6] It is not clear from the record who Anne Guthrie is or why she was present at this meeting.

On July 9, 2018, A.S. presented to the care of Steven Herold, M.D., a pediatric cardiologist, for an evaluation. R. 718–20. Dr. Herold notes that A.S. had a history of a "tiny muscular ventricular septal defect." R. 718. A.S. underwent an echocardiogram, which was unremarkable aside from a tiny low muscular ventricular septal defect. R. 796. Physical examination findings were unremarkable, and Dr. Herold indicated that A.S. needed only simple observation. R. 719–20. Dr. Herold placed no limitations on A.S.'s activity from a cardiac standpoint. R. 720.

On August 3, 2018, Megan Michaels, B.S., of New River Valley Community Services, conducted a home visit. R. 518–19. A.S.'s mom expressed her concern about A.S.'s anxiety with school. R. 518.

On August 21, 2018, Ms. Michaels spoke with A.S.'s mother about a meltdown A.S. had on the drive to school that morning. R. 547. A.S.'s mother reported that A.S. was very upset and had been bullied during recess the previous day, and that nothing had been done despite her contacting A.S.'s teacher and principal. *Id.*

On September 4, 2018, Ms. Michaels met with A.S.'s mother and teachers. R. 561. A.S.'s teachers reported that he was doing well socially and academically, and they had not seen any issues with anxiety aside from being dropped off at school. *Id.* They reported that they did not see any bullying occur. *Id.*

On September 17, 2018, Ms. Michaels spoke with A.S.'s mother, who claimed that a certain child was continuing to bully A.S., and that she did not make A.S. go to school for two days within the previous week because of his anxiety. R. 565.

On October 12, 2018, Ms. Michaels met with A.S.'s mother, who reported that a certain child was continuing to be mean to A.S. at school; however, a teacher contacted A.S.'s mother

about witnessing the issue and had taken action to correct the problem. R. 568. A.S.'s mother reported that A.S. exhibited less anxiety about going to school, but his anxious feelings were still prevalent. *Id.* She reported that A.S. exhibited frequent meltdowns and outbursts when he did not get his way. *Id.*

On January 7, 2019, Ms. Michaels attended a parent-teacher conference to initiate a 504 plan for A.S. because of his continuous absences due to illness. R. 588.

On January 29, 2019, A.S. presented to the care of Stacy Moore, FNP, of Shawsville Family Medicine. R. 701–03. A.S.'s mother reported that A.S.'s anxiety had increased and his teachers noticed that A.S. often seemed worried and nervous. R. 701. She reported that A.S. can become irritable, shaky, and angry at times. *Id.* Ms. Moore referred A.S. for counseling. R. 703.

On February 8, 2019, Ms. Michaels spoke with A.S.'s mother, who claimed that A.S.'s anxiety at school had improved; however, she reported that A.S. is still afraid of a certain child at school and his teacher does not seem to notice the issue. R. 610.

On February 28, 2019, A.S. presented to the care of Emily Doherty, M.D., at Roanoke Clinical Genetics, for genetic testing to confirm the subtype of his Charcot-Marie-Tooth disease. R. 695–66.

On March 1, 2019, Ms. Michaels attended a scheduled 504 meeting at A.S.'s school. R. 618. Numerous school staff attended the meeting, which centered around A.S.'s issues and whether he was eligible for 504 accommodations. *Id.* The panel ultimately decided that A.S.'s issues did not qualify him for 504 accommodations, but they discussed alternative methods to combat A.S.'s anxiety towards school. *Id.*

On June 18, 2019, A.S. returned to the care of Dr. Hart for a gastrointestinal follow-up. R. 681–82. The record indicates A.S. experienced persistent constipation. *Id.*

On June 28, 2019, Ms. Michaels conducted a home visit with A.S. and his mother. R. 839. A.S.'s mother reported that A.S. had been doing well but had some anxiety about his mother not being able to walk him to class. *Id.* She reported that A.S. does not have sleepovers because of anxiety and cannot spend the night at his grandmother's house without his mother being there. *Id.* A.S. explained that he constantly wants to leave school because he gets headaches, and if the headaches were fixed, then he would feel better about going to school. *Id.*

On July 3, 2019, A.S. presented to the care of Mebratu Daba, M.D., of Carilion Clinic Pediatric Neurology. R. 679–81. Physical examination findings were unremarkable aside from a gait with bilateral in-toeing. R. 681. Dr. Daba noted that A.S. had outgrown his leg braces. *Id.* Dr. Daba continued A.S. on 75 mg amitriptyline daily and recommended A.S. continue outpatient physical therapy. *Id.*

On August 5, 2019, Ms. Michaels attended a scheduled home visit with A.S., his mother, and one of his clinicians (in-named in the medical record). R. 893. A.S.'s mother reported that A.S. was generally well over the summer and had less anxiety. *Id.* She reported that A.S. continued to experience anxiety when thinking about the upcoming school year and whether his mother would be able to walk him to class. *Id.*

On August 20, 2019, Ms. Michaels spoke with A.S.'s mother. R. 899. A.S.'s mother reported that A.S. was doing well since the start of the school year and had not experienced anxiety yet. *Id.* She reported that A.S. was enjoying school and had lots of friends. *Id.*

On October 11, 2019, Alexandra Reese, QMHP-C, BSW, of New River Valley Community Services met with A.S. and his mother. R. 923–24. A.S.'s mother indicated that A.S. seemed to qualify for a 504 at school and a doctor wrote a letter stating as much, but the school

never implemented that. R. 923. A.S.'s mother stated that she often struggles with the school over A.S.'s anxiety. *Id.*

On October 24, 2019, A.S. returned to the care of Dr. Daba for a neurology follow-up. R. 669–71. A.S. walked with his right foot in-turned. R. 669. A.S.'s mother reported A.S. continued to have frequent episodes of falling and complains of intermittent neuropathic pain; however, she had not yet set up an appointment for outpatient physical therapy. *Id.* A.S.'s mother reported no other concerns. *Id.* Physical examination findings were unremarkable. R. 670–71. A.S.'s mother reported that A.S. outgrew his leg braces but she had not yet gotten new braces for him. R. 671.

On November 13, 2019, A.S. presented to the care of Matthew Mitchell, PT, DPT at New River Valley Medical Center for a physical therapy evaluation. R. 661–65. A.S. reported issues with his feet, knees, hips, and arms, and he noted that his left leg bothers him more than his right. R. 663. A.S.'s mother stated that it seems like it takes A.S. longer to walk around in school to get from place to place. *Id.* She reported that she has to park closer to stores because A.S. fatigues quickly. *Id.* Physical examination findings were unremarkable, and Mr. Mitchell observed no significant abnormalities in A.S.'s gait. R. 663–64. Mr. Mitchell planned for A.S. to be seen twice a week for eight weeks to focus on range-of-motion/joint mobilizations, gait training, balance training, functional strengthening, and neuromuscular reeducation. R. 664–65.

On November 19, 2019, A.S. underwent physical therapy at New River Valley Medical Center. R. 659–61. A.S. reported that he was doing his exercises but found them to be boring. R. 660. He denied any pain and stated that he had no falls since his last physical therapy appointment. *Id.*

On November 21, 2019, A.S. underwent physical therapy at New River Valley Medical Center. R. 657–59. A.S.'s mother reported he fell twice since his last visit and experiences pain in his lower legs. R. 658.

On December 5, 2019, A.S. underwent physical therapy at New River Valley Medical Center. R. 652–54. A.S.'s mother reported that he was doing about the same overall. R. 653. She noted they were out of medication for his legs and his legs were hurting more at night. *Id.* A.S. reported that his legs felt better after undergoing physical therapy, and he stated he "do[esn't] really have much pain." *Id.*

On December 12, 2019, A.S. underwent physical therapy at New River Valley Medical Center. R. 650–52. A.S.'s mother reported he was doing a little better. R. 650. A.S. denied any pain in his legs or feet. *Id.* The physical therapist notes that A.S. was limited with his compliance and ability to follow commands at that visit. R. 651. A.S. would not listen to his mother or the physical therapist. *Id.* The physical therapist terminated the session because of the significant limitations of any therapeutic benefit that day. *Id.*

On December 19, 2019, A.S. underwent physical therapy at New River Valley Medical Center. R. 647–49. A.S.'s mother reported that A.S. had not complained about pain "for awhile now," and A.S. had been able to do everything he wanted to do. R. 648.

On December 23, 2019, Marinna Dowdy, B.S., of New River Valley Community Services, conducted a home visit with A.S. and his mother. R. 954. When Ms. Dowdy arrived, A.S. was playing video games. *Id.* A.S.'s mother reported that A.S. and his father often played video games together. *Id.* A.S.'s mother stated that she was worried about A.S.'s hyperactivity level. *Id.*

17

On January 16, 2020, A.S. was discharged from physical therapy at New River Valley Medical Center. R. 644. A.S. had not attended other physical therapy appointments on January 2 and January 9. R. 647.

On January 28, 2020, A.S. presented to the care of Richard Cordle, M.D., at Roanoke Pediatric Gastroenterology for an evaluation. R. 977–81. A.S.'s mother reported that he continued to suffer from generalized abdominal pain randomly, which would awaken him at times. R. 977. Physical examination findings were unremarkable aside from palpable stool in the lower left quadrant. R. 979–80. Dr. Cordle noted that A.S.'s abdominal pain is likely related to constipation based on the physical examination. R. 980. Dr. Cordle started A.S. on Culturelle and MiraLAX. *Id.*

On January 31, 2020, Ms. Dowdy spoke with A.S.'s mother. R. 960. A.S.'s mother reported that A.S. was doing well in school but continued to have a lot of anxiety. *Id.*

On May 13, 2020, Ms. Dowdy spoke with A.S. and his mother in a telehealth visit. R. 1022. A.S.'s mother stated that A.S.'s anxiety had decreased, and his anxiety currently focused on what his summer would be like in light of the COVID-19 pandemic. *Id.* A.S.'s mother told him that he could not stay inside and play video games all day, so A.S. started going outside. *Id.*

On June 29, 2020, Ms. Dowdy spoke with A.S. and his mother for a telehealth visit. R. 1030. A.S.'s mother stated that he was enjoying summer. *Id.* A.S. stated that he had been playing video games with his father when his father returned home from work in the evenings. *Id.* A.S.'s mother stated that she was trying to get A.S. outside more during the day before his father gets home. *Id.*

On July 17, 2020, Ms. Dowdy met with A.S. and his mother at a local park. R. 1032. A.S.'s mother reported that he had less anxiety lately and was not worried about school starting.

*Id.* She reported that A.S. was starting to show more anxiety about other things, such as losing games and what he wants to do for the day. *Id.* She reported that she spoke with A.S. about the plan for school and that she would not be able to walk him in, and A.S. stated he was fine with that. *Id.*

On October 2, 2020, A.S. returned to the care of Dr. Daba for a neurology follow-up. R. 1040–44. A.S.'s mother reported that he mostly stays at home with limited outside activities and trips more than falls. R. 1040. Physical examination findings were unremarkable. R. 1042–44. Dr. Daba continued A.S. on amitriptyline. R. 1044.

On March 10, 2021, Ms. Dowdy spoke with A.S.'s mother. R. 1129. A.S.'s mother reported that A.S. was experiencing increased anxiety since returning to school because other children were not keeping their masks on. *Id.*

On May 25, 2021, A.S. was discharged from services at New River Valley Community Services for non-compliance. R. 1143. Ms. Dowdy noted that A.S.'s family was not responding to her inquiries. R. 1141, 1143.

**B. School Progress Reports and Teacher Questionnaires**

In May 2020, A.S.'s third grade homeroom teacher completed an Elementary School Progress Report. R. 303–05. A.S.'s final grades were A's in all subjects, and the marking key indicates that A.S. meets or exceeds expectations in all applicable subjects and work habits. R. 303. For Q1, A.S.'s teacher noted that A.S. "is a student who always does his best work and is very responsible." R. 304. For Q2, A.S.'s teacher noted that A.S. "is a very responsible student who is always willing to help others." *Id.* For Q3, A.S.'s teacher noted that A.S. "continues to show growth in his academic and social skills." R. 305.

In May 2021, A.S.'s fourth grade homeroom teacher completed an Elementary School Progress Report. R. 299–301. A.S.'s final grades were A's in all subjects except for reading, which was a B, and the marking key indicates that A.S. meets or exceeds expectations in all applicable subjects and work habits. R. 299. A.S.'s teacher remarked that A.S. "is a sweet and caring student," who his teacher "could always count on." *Id.* For Q1, A.S.'s teacher noted that A.S. "is someone that I can always count on to be focused and participating." R. 300. For Q2, A.S.'s teacher noted "I am impressed by [A.S.'s] ability to stay focused and engaged in class and his level of responsibility in completing independent assignments." *Id.* For Q3, A.S.'s teacher noted A.S. "is a highly motivated student that is truly doing a great job with learning from home," and is "someone that I can always count on to be ready with an answer and eager to participate!" R. 301.

On October 5, 2021, A.S.'s fifth grade teacher completed a Teacher Questionnaire. *See* ECF No. 15-1.[7] A.S.'s teacher indicates that A.S. was currently "On Level" in his Reading Level, Math Level, and Written Language Level. *Id.* A.S.'s teacher indicated "No problems observed" in the domains of Acquiring and Using Information, Attending and Completing Tasks, Interacting and Relating with Others, Moving About and Manipulating Objects, Caring for Himself or Herself. *Id.* at 2–5. A.S.'s teacher noted that because she taught A.S. in a virtual setting, she could not accurately answer questions relating to the domains of Moving About and Manipulating Objects and Caring for Himself or Herself; however, based on her interactions with A.S., she sees no concerns in those domains. *Id.* at 8.

---

[7] The Teacher Questionnaire that appears in the record at R. 344–351, is blank, but Christy's counsel represents that form is not blank in the claim file. *See* ECF No. 15 at 5. As a result, Christy's counsel included the completed Teacher Questionnaire in her brief.

### C.  Medical Opinions

In a Disability Determination Report dated April 30, 2020, Daniel Walter, PsyD, a psychological consultant with Disability Determination Service, and Richard Surrusco, MD, a medical consultant with Disability Determination Service, indicated that A.S. has the following severe impairments: Motor Neuron Disorders Other than ALS and Anxiety and Obsessive-Compulsive Disorders. R. 109–110. They indicated that A.S. has "no limitations" in the domains of Acquiring and Using Information, Attending and Completing Tasks, and Health and Physical Well-Being. *Id.* They indicated that A.S. has "less than marked" limitations in the domains ofInteracting and Relating with Others, Moving About and Manipulating Objects, and Caring for Yourself. *Id.*

In a Disability Determination report dated November 18, 2020, Nicole Sampson, Ph.D., a psychological consultant with Disability Determination Service, and Joseph Duckwall, M.D., a medical consultant with Disability Determination Service, indicated that A.S. has the following severe impairments: Other Disorders of the Nervous System and Anxiety and Obsessive-Compulsive Disorders. R. 116–17. They determined that A.S.'s Other Disorders of the Gastrointestinal System were non-severe. R. 116. They determined that A.S. has "no limitation" in the domains of Acquiring and Using Information and Attending and Completing Tasks. *Id.* They determined that A.S. has "less than marked" limitations in the domains of Interacting and Relating with Others, Moving About and Manipulating Objects, Caring for Yourself, and Health and Physical Well-Being. R. 117.

### D.  Testimony

Christy appeared and testified at the September 29, 2021, hearing before the ALJ. R. 59–71. Christy indicated that A.S. was unable to concentrate in school when he was in-person. R. 54.

Christy testified A.S.'s Charcot-Marie-Tooth disease causes him to fall when walking through the house. R. 59. She testified she had to help A.S. in and out of the bathtub. *Id.* She testified she had to help him dry off and dress himself. *Id.*

Christy testified that A.S. has pain is in his lower legs, and he complains daily about his pain, which he describes as a sharp pain. R. 60. She testified that A.S. falls every other day. *Id.* A.S. was not allowed to do various activities in physical education class, such as running, rock climbing, or football. R. 61. A.S. is able to ride a bike for only five or ten minutes before his legs start hurting. *Id.* She additionally testified that while A.S. used leg braces in the past, he no longer uses them because he outgrew his last pair. *Id.*

With regard to A.S.'s anxiety, Christy testified hisanxiety improved when he no longer had to physically go to school. R. 63, and that his anxiety was triggered by school. R. 64, 68. His anxiety was also triggered by being separated from her. R. 69.

Christy testified that A.S. continued to have issues with constipation on a monthly basis. *Id.* His constipation typically lasted for a couple days. *Id.* A.S.'s septal defect occasionally caused slight breathing difficulties. R. 65. A.S. continues to suffer from headaches about two or three times a week and were accompanied by vomiting. R. 65–66. She testified that A.S. takes Tylenol for his headaches. R. 70.

## ANALYSIS

Christy challenges the ALJ's determination that A.S. has less than marked limitation in Domain V, caring for self. ECF No. 15 at 20–24. Christy further alleges the ALJ's assessment of her allegations are not supported by substantial evidence. *Id.* at 24–26.

I.  **The Commissioner's Decision is Consistent with the Statutory and Regulatory Framework for Evaluating A.S.'s SSI Claim.**

As explained above, under the regulations, the determination of whether a child is disabled requires a three-step inquiry. *See* 20 C.F.R. § 416.924. The first step is to determine whether the child is working and performing substantial gainful activity. *Id*. § 416.924(b). If the child is not working, it must then be determined whether the child suffers from a severe impairment or combination of impairments. *Id*. § 416.924(c). If the child suffers from a severe impairment or combination of impairments, it must then be determined whether the child's impairment(s) meet, medically equal, or functionally equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id*. § 416.924(d).

At step one, the ALJ determined that A.S. is not engaged in substantial gainful activity. R. 14. At step two, the ALJ determined that A.S. has the following severe impairments: Charcot-Marie-Tooth disease, thoracic spine kyphosis, and anxiety disorder. *Id.* At step three, the ALJ found that A.S.'s impairments did not functionally equal the severity of listings. R. 15–16. The ALJ concluded A.S. had a marked limitation in Domain IV, moving about and manipulating objects, but a less than marked limitation in all other domains. R. 17.

Christy claims the medical evidence supports a finding that A.S. has marked limitations in Domain III, Moving About and Manipulating Objects, Domain V, Caring for Self; and Domain VI, Health and Physical Well-Being. R. 19–20. However, aside from this conclusory statement, she offers no facts or argument why the ALJ's conclusions are not supported by substantial evidence. The ALJ did conclude A.S. has marked limitations in Domain III, moving about and manipulating objects. R. 26–27. The ALJ's conclusions about A.S.'s limitations in Domain III are addressed in Section II *infra*.  As for Domain VI, health and physical well-being, the ALJ concluded A.S. has less than marked limitations in that domain. R. 29.

When reviewing the domain of health and physical well-being, the ALJ considers the cumulative physical effects of physical or mental impairments and their associated treatments or therapies on a child's functioning. *See* 20 C.F.R. § 416.0926a(l). Some examples of difficulties children might have in health or physical well-being include generalized symptoms, somatic complaints related to impairments, limitations in physical functioning because of treatment, or medical fragility and need for intensive medical care. *See id.*

Here, the ALJ considered the opinions of the state agency consultants at the initial level, who opined A.S. had no limitations in health and physical well-being, as well as the opinions of the state agency consultants at the reconsideration level, who opined A.S. had less than marked limitations in health and physical well-being. R. 29. The ALJ explained he found the opinions of the state agency consultants on reconsideration to be more persuasive. *Id.* The ALJ correctly points out that A.S. performed well at school despite his frequent absences. *Id.* Furthermore, the record does not contain any indication that A.S. underwent frequent treatment or therapy that resulted in any limitations in physical functioning. To the extent A.S. underwent physical therapy, he did well, often denied pain, and saw general improvement in his condition. R. 644–665. Throughout the record, physical examination findings were generally normal aside from some abnormalities in A.S.'s gait, and A.S. underwent an EGD (esophagogastroduodenoscopy) which showed normal results. R. 807–09.

Therefore, I find the ALJ's conclusion regarding A.S.'s limitations in the domain of health and physical well-being is supported by substantial evidence. Likewise, as discussed below, his conclusion that A.S.'s limitations in the domain of caring for oneself is supported by substantial evidence. As a result, substantial evidence supports the ALJ's determination that A.S.'s impairments do not functionally equal the listing of impairments.

## II. Substantial evidence supports the finding that A.S. had less than a marked limitation in Domain V, caring for self.

Christy argues the ALJ erred in his determination that A.S. has less than marked limitation in Domain V, caring for self. ECF No. 15 at 20–24.

In support of her argument regarding A.S.'s caring for oneself, Christy mainly restates favorable evidence in the record, but also alleges that the ALJ's assessment of the evidence is "cursory" and not supported by substantial evidence. *Id.* In consideration of Christy's and the Commissioner's arguments, the undersigned finds there is substantial evidence to support the ALJ's decision.

When reviewing the domain of caring for yourself, the ALJ must consider how well the child maintains a healthy emotional and physical state, including how well the child gets his or her physical and emotional wants and needs met in appropriate ways; how the child copes with stress and changes in his or her environment; and whether the child takes care of his or her own health, possessions, and living area. 20 C.F.R. § 416.926a(k).

In reviewing Domain V, caring for yourself, the ALJ considered the state agency determinations regarding A.S.'s limitations and found those opinions partially persuasive. R. 22–23. The state agency consultants found A.S had less than marked limitations in the domain of caring for oneself. R. 110, 117. The ALJ explained that while Christy indicated A.S. required help getting in and out of the bathtub and getting dressed, she indicated A.S. was able to engage in other self-care tasks. R. 28. Specifically, in the function report, Christy indicates that A.S. is able to use a zipper; tie shoelaces; brush his teeth; comb or brush his hair; wash his hair by himself; eat using a fork, knife, and spoon; pick up and put away his toys; help around the house; do what he is told most of the time; obey safety rules; get to school on time; and accept criticism or correction. R. 258. Additionally, the ALJ points out that A.S.'s teacher noted no issues in A.S.'s ability to care

for himself, although she does note she only saw him over video. R. 28. Overall, there is substantial evidence in the record to support the ALJ's conclusion that A.S. has a less than marked limitation in the domain of caring for himself.

Christy suggests the ALJ ignored evidence or minimized evidence to support his conclusions, but that is simply not the case. The ALJ summarizes in detail the medical evidence and school records relevant to A.S.'s limitations in caring for himself. Although Christy believes a different conclusion is warranted based upon the evidence in the record, if the ALJ applied the correct legal standard and engaged in an analysis providing the undersigned with the necessary "logical bridge" between the evidence and the ALJ's conclusion, I must defer to the ALJ's decision. *See Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Accordingly, there is substantial evidence to affirm the ALJ's decision regarding his conclusion that A.S. has less than marked limitations in Domain V, caring for yourself.

### III.  Substantial evidence supports the ALJ's assessment of Christy's allegations.

Christy argues that the ALJ erred in his assessment of her allegations about A.S.'s symptoms as the ALJ failed to explain how he evaluated Christy's allegations or how he arrived at his decision that Christy's allegations are inconsistent with the evidence in the record and failed to make specific findings regarding Christy's credibility. ECF No. 15 at 25.

Under the regulations implementing the Social Security Act, an ALJ follows a two-step analysis when considering a claimant's subjective statements about impairments and symptoms. *See* 20 C.F.R. § 416.929(b)-(c). First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms. *Id*. § 416.929(b). Second, the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the child's functioning. *Id*. § 416.929(c). When evaluating

the intensity and persistence of a child's symptoms, the ALJ will consider all of the evidence presented, including evidence submitted by a child's medical sources (such as physicians, psychologists, and therapists) and nonmedical sources (such as educational agencies and personnel, parents and other relatives, and social welfare agencies). 20 C.F.R. § 416.929(c)(3); SSR 16-3p, 2017 WL 5180304, at *6. "If the claimant is a child who does not describe, or cannot adequately describe, his symptoms the ALJ will accept as a statement of [the child's] symptom(s) the description given by the person who is most familiar with [the child], such as a parent, other relativel, or guardian." *Gerette v. Colvin*, No. 7:15-CV-12, 2016 U.S. Dist. LEXIS 43475, at *8 (W.D. Va. Feb. 2, 2016).

Here, the ALJ determined that A.S.'s medically determinable impairments could reasonably expect to cause A.S.'s alleged symptoms, but that Christy's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record. R. 22. Throughout his decision, the ALJ summarized Christy's allegations regarding A.S.'s functioning. R. 22–29. The ALJ reviews the medical and educational records in depth to explain how the record does not support the intensity, persistent, and limiting effect of A.S.'s symptoms and Christy's allegations. *Id.*

Christy specifically contends that her allegations regarding A.S. caring for himself were supported by the medical evidence and school records. ECF No. 15 at 25. However, as discussed in Section II *supra*, the ALJ did not dispute that A.S. had some limitations in that domain but not to a severity to be considered "marked." Citing to 20 C.F.R. § 416.926a(k)(3) and SSR 09-7p, the ALJ listed several examples of difficulty children might have in caring for themselves. R. 28. Aside from his mother's assistance in bathing and dressing himself, the record does not indicate that A.S. has any other significant difficulties in caring for himself such that the ALJ's conclusions

are not supported by substantial evidence. In other words, the record supports the ALJ's conclusion that, while A.S. does have some limitations in caring for himself, those limitations are less than marked.

The ALJ reached the rational conclusion, in considering the medical and school records, that A.S.'s ability to care for himself had only less than marked limitations. R. 20. The ALJ supported this conclusion by pointing to the state agency consultants, who opined that A.S. had less than marked limitations in that functional domain. *Id.* The ALJ also noted that Christy previously indicated that A.S. was able to engage in other self-care tasks. *Id.* Additionally, the ALJ pointed out that A.S. was appropriately dressed and groomed at appointments, and his teachers noted no issues in that area. *Id.* Overall, the record supports the ALJ's conclusions regarding the credibility of Christy's allegations.

In sum, the ALJ considered Christy's allegations regarding A.S.'s symptoms and crafted an evidence-based assessment of his abilities and limitations through review of the other evidence in the record. A reviewing court gives great weight to the ALJ's credibility assessments and should not interfere with that assessment where the evidence in the record supports the ALJ's conclusions. *See Shively v. Heckler*, 739 F.2d 987, 989–90 (4th Cir. 1984). Accordingly, I conclude that the ALJ supported his analysis of Christy's allegations with substantial evidence, and the record supports his conclusions.

## CONCLUSION

For the above reasons, I recommend the presiding District Judge **DENY** Christy's Motion for Summary Judgment, ECF No. 14; **GRANT** the Commissioner's Motion for Summary Judgment, ECF No. 24; **AFFIRM** the Commissioner's final decision denying SSI benefits to A.S. and **DISMISS** this case from the Court's active docket.

**Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable Robert S. Ballou, United States District Judge.

The Clerk shall serve copies of this Report and Recommendation on all counsel of record and any unrepresented parties.

Entered:  August 5, 2024

*C. Kailani Memmer*

C. Kailani Memmer
United States Magistrate Judge